UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
TIFFANY KANTROWITZ,

|  |  |  |
|---|---|---|
| | Plaintiff, | 16 Civ. 2813 |
| | | **COMPLAINT** |
| - against - | | **AND JURY DEMAND** |

THE PROCTER AND GAMBLE COMPANY,

Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Plaintiff, Tiffany Kantrowitz ("Plaintiff" or "Ms. Kantrowitz"), by her attorneys, Beranbaum Menken LLP, complaining of Defendant The Procter and Gamble Company ("Defendant" or "P&G"), alleges:

## PRELIMINARY STATEMENT

1.      Plaintiff Tiffany Kantrowitz brings this action, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 1981A ("Title VII"), the American with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), as amended by the ADA Amendments Act of 2008, and the New York City Human Rights Law ("NYCHRL"), Administrative Code of the City of New York §§ 8-101 *et seq*, to remedy P&G's refusal to accommodate her pregnancy and its retaliatory termination of her employment.  Ms. Kantrowitz seeks injunctive and declaratory relief, compensatory and punitive damages, attorneys' fees, and all other appropriate relief pursuant to federal and local law.

2.      Ms. Kantrowitz, a P&G employee of two years in good standing who sold products geared to women at P&G's Dolce and Gabbana ("D&G") makeup shop at Saks Fifth Avenue in

Manhattan, was fired after she announced she was pregnant and pressed for a reasonable accommodation so she could continue to work while experiencing the side effects of her pregnancy.  Her modest, reasonable, and lawful accommodation request to simply sit for a few minutes while continuing to work was met by Defendant with hostility and denied.  P&G instead proposed "accommodations" which were physically taxing, would adversely affect her ability to meet her sales targets, and unlawfully forced her to use leave time under the Family Medical Leave Act ("FMLA").  After Ms. Kantrowitz complained to P&G's Human Resources department, the company fired her for a pretextual reason.

3.      P&G thwarted Ms. Kantrowitz's efforts to obtain a reasonable accommodation, and ultimately fired her, because it did not want a pregnant woman selling its makeup products, which, as Defendant advertises, are "inspired by the Dolce & Gabbana woman who is always looking for the perfect look each day." *See* http://www.dolcegabbana.com/beauty/makeup/.  For Defendant, ever vigilant about the image of its makeup shop Sales Associates, pregnancy did not comport with the "perfect look." As one of Ms. Kantrowitz's supervisors revealingly remarked about P&G's makeup shop saleswomen, "Pregnancy is not part of the uniform."

**JURISDICTION AND VENUE**

4.      On June 4, 2015, Ms. Kantrowitz filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission, complaining of the unlawful discriminatory acts alleged herein, and obtained from the agency a Notice of Right to Sue, dated March 1, 2016, less than 90 days from the filing of this Complaint.

5.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332 and 1343

2

and 42 U.S.C. § 2000e-5(f)(3). This Court also has supplemental jurisdiction over Ms. Kantrowitz's City law claims pursuant to 28 U.S.C. § 1367.

6.      As Defendant regularly does business within the Southern District of New York, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 2000e-5(f)(3).  Additionally, the acts that form the basis of this lawsuit occurred within this jurisdiction.

7.      Contemporaneously with instituting this lawsuit, Plaintiff submitted copies of the Complaint to the New York City Commission on Human Rights and Department of Law.

## **PARTIES**

8.      At all times relevant to this action, Tiffany Kantrowitz was a resident of New York City.

9.      Defendant P&G is an American multinational consumer goods company headquartered and incorporated in Cincinnati, Ohio, and doing business in New York City. Proctor and Gamble Prestige Products ("P&G Prestige") is P&G's fine fragrance and cosmetics division, which is headquartered in New York and Geneva, Switzerland.  P&G Prestige manages a portfolio of well-known luxury fragrance and cosmetics brands, including Dolce & Gabbana.

10.     At all times relevant to this suit, P&G was Ms. Kantrowitz's employer within the meaning of Title VII and the ADA, 42 U.S.C. § 12111(5)(A), and New York City Admn. Code § 8-102(5).

## FACTUAL ALLEGATIONS

### Ms. Kantrowitz's Employment at P&G

11.     Before being fired on February 13, 2015, Ms. Kantrowitz worked for P&G as a Beauty Stylist and Sales Associate for P&G's Dolce and Gabbana makeup shop located within the Saks Fifth Avenue store at 611 Fifth Avenue, New York, NY 10022.  She worked there for approximately two years.

12.     As one of four Beauty Stylist and Sales Associates at the store, Ms. Kantrowitz sold high-end D&G makeup to store clientele, developed and maintained relationships with regular clients, mentored team members on working with clients, contributed to increased brand sales, and helped successfully execute promotional events.

13.     Ms. Kantrowitz was a top performing salesperson and regularly exceeded the sales expectations set by upper management.

14.     Based on her exemplary performance, Account Executive Lindsay Lobello asked Ms. Kantrowitz in August 2014 to perform managerial duties on an interim basis while P&G searched for a replacement for a manager who recently had departed.

### The Paramount Importance P&G Placed on Employee Image

15.     P&G meticulously and persistently policed the appearance of its makeup counter sales employees.  At her job interview, the interviewer asked Ms. Kantrowitz if she could adhere to P&G's strict image rules, which included wearing her hair pulled back, bold colored lipstick, makeup applied as directed by P&G, and a black pantsuit tailored to P&G's liking.

16.     When Ms. Kantrowitz began working at P&G, she received a document containing image guidelines which she was required to sign.  In addition to some of the image rules

mentioned in her interview, the guidelines prohibited her from having tattoos or certain piercings, and the dress code was explained with great attention to detail from head to toe.

17.     Throughout her employ with P&G, Ms. Kantrowitz received and was required to sign updated image guidelines.

18.     Ms. Kantrowitz's superiors constantly checked on her and her fellow Sales Associates' appearance while they worked at the makeup counter.  On days when a P&G representative from the corporate office visited the store, supervisors would "look over" or inspect the attire and appearance of Sales Associates like Ms. Kantrowitz.

19.     At times, P&G employees were sent home for not complying with the company's strict image regulations.

20.     In nearly every sales team meeting Ms. Kantrowitz attended, her superiors discussed the appearance and image of the Sales Associates.

21.     In May or June of 2014, Ms. Kantrowitz and her manager at the time, Isaac Gurrola, were speaking to a client who had recently given birth.  Ms. Kantrowitz, who was newly married, made a comment about wanting to have a baby of her own.  Mr. Gurrola remarked to Ms. Kantrowitz, "Pregnancy is not part of the uniform."

**Ms. Kantrowitz's Pregnancy-Related Symptoms Requiring a Reasonable Accommodation**

22.     In October 2014, Ms. Kantrowitz became pregnant. As a result of the pregnancy, almost immediately, she began suffering extreme nausea, dizziness, severe fatigue, and chronic headaches.

23.     Ms. Kantrowitz still came to work every day.  However, the aforementioned symptoms required her to occasionally sit down while on the job.

5

24.     On November 14, 2014, Ms. Kantrowitz, while on duty, began to feel faint.  At the time, P&G's Saks Fifth Avenue D&G Makeup Shop was understaffed and she was the only Sales Associate at the counter.  Rather than abandon the makeup counter, she continued to work and attend to customers while sitting on a makeup stool behind the counter.

25.     When other staff members eventually arrived, Ms. Kantrowitz was still not feeling well due to her pregnancy-related symptoms. She informed her manager, Ms. Lobello, and other coworkers that she was ill and had to leave work.

26.     Four days later, on November 18, 2014, Ms. Kantrowitz was surprised to receive a written warning from Ms. Lobello informing her that she had violated P&G expectations by sitting in the makeup chair while using her cell phone.  In fact, she was conducting work-related business from her cell phone.  When she issued the warning, Ms. Lobello knew that Ms. Kantrowitz had been feeling unwell that day.

27.     At the time she issued the written warning, Ms. Lobello also falsely suggested that Ms. Kantrowitz had received a previous verbal warning for an unrelated alleged infraction.

### P&G's Failure to Engage in an Interactive Process Regarding Ms. Kantrowitz's Accommodation Request

28.     Upon receiving the written warning, Ms. Kantrowitz emailed Monica Sood, the Human Resources ("HR") representative copied on the warning notice, and asked to meet with her to discuss the allegations made in the warning.  In the email, Ms. Kantrowitz informed Ms. Sood that she had a medical condition that necessitated her sitting down at work.

29.     Ms. Sood, however, refused to meet with Ms. Kantrowitz.  Instead, she instructed Ms. Kantrowitz to contact P&G's Health Services and directed her to different HR representatives.

30.     On November 24, 2014, Ms. Kantrowitz met with HR representatives Carla Bennett and Hallam Sargeant.  She disclosed that she was pregnant and gave them two doctors' notes explaining that she was suffering from the side-effects of pregnancy.  In their notes, Ms. Kantrowitz's doctors recommended that she refrain from standing for long periods of time and limit strenuous physical activity.

31.     Ms. Kantrowitz asked the HR representatives for a reasonable accommodation to her pregnancy that would allow her to sit when needed, so she could continue to work during her pregnancy.

32.     Permitting Ms. Kantrowitz to periodically sit for a few minutes at her workstation— while continuing to work—would not pose any difficulty or expense for P&G.

33.     Moreover, Ms. Kantrowitz's proposed accommodation was consistent with the Beauty Stylist and Associate Position job description, which does not require the employee to stand while performing job duties.

34.     The HR representatives refused to accommodate Ms. Kantrowitz, saying that she should be held to the same standard as her coworkers—regardless of whether or not those coworkers were pregnant.

35.      Treating Ms. Kantrowitz's accommodation request strictly as a health matter, an HR representative referred her to P&G's Health Services, although, on information and belief, HR, not Health Services, had authority over workplace accommodation requests.

36.     Ms. Kantrowitz informed the Health Services representative, Marianne Grady, that she was pregnant and shared with her the two doctors' letters.  Rather than consider this an accommodation request, Ms. Grady advised her to go on temporary disability leave.

7

37.     Ms. Kantrowitz was not eligible to go on disability due to a paperwork mistake by HR when she started her employment.  In any event, Ms. Kantrowitz had no desire to go on leave since she was perfectly capable of continuing to work so long as she was permitted to sit down occasionally.

38.     In the weeks that followed Ms. Kantrowitz's November 24, 2014 accommodation request, P&G made no effort to accommodate Ms. Kantrowitz's pregnancy or even engage in an interactive process with her.  Instead, in what appeared to be a delay tactic, P&G demanded multiple doctors' letters—all of which made the same recommendation that P&G allow Ms. Kantrowitz to sit down for a few minutes every few hours.

39.     While Ms. Kantrowitz waited for P&G to respond to her accommodation request, she continued to feel the side effects of her pregnancy but was afraid to sit down while working for fear of being disciplined.  Suffering from both physical and mental stress, Ms. Kantrowitz became increasingly concerned for her and her baby's health.

### P&G's Refusal to Accommodate Ms. Kantrowitz by Allowing Her to Occasionally Sit at the Makeup Counter

40.     On December 16, 2014, more than three weeks after Ms. Kantrowitz requested as an accommodation to her pregnancy that she be allowed to intermittently sit while working at the makeup counter, P&G offered her an alternate arrangement to provide her periodic breaks—but one with such onerous conditions as to leave her even worse off than if she had no accommodation.

41.     As an "accommodation," P&G permitted Ms. Kantrowitz to take breaks of no more than 5-10 minutes every few hours in one of two designated rooms, both of which were located on

8

different floors from where she worked: one was the 9th floor employee lounge and the other was the employee locker room in the basement.

42.     Getting to either of the proposed break sites required her to walk to the elevator, take the elevator, walk to the room, and then return to her worksite—a circuit taking up nearly all of the 5-10 minutes she was given to rest.

43.     Moreover, the act of walking at the exact time she needed to sit due to dizziness or extreme fatigue was even more onerous than requiring her to stand.

44.     P&G's proposal was also irrational.  It made it impossible for Ms. Kantrowitz to work during these breaks whereas had she been permitted to sit at the counter, she could have performed such duties as interacting with clients, writing work-related emails, and sending thank-you notes to customers, all while continuing to assist customers.

45.     P&G's proposed solution, in addition, penalized Ms. Kantrowitz by keeping her away from the sales counter, thereby making it more difficult for her to meet her sales expectations.  If she failed to meet these targets, she faced being written up by her supervisors.

46.     P&G refused to adjust her sales goals to account for the reduced work time, even though the company had previously done so for non-pregnant employees on medical leave.

47.     In addition to the physical challenge of traveling to one of the designated off-site break rooms, she was reluctant to use them because she feared missing her sales targets.

48.     Ms. Kantrowitz availed herself of P&G's "accommodation" about 10 times, sometimes going to the 9th floor break room and other times to the employee locker room in the basement.  More than once, she had to suspend her trek to the designated room and lean against a wall to hold herself up.

49.     As a result of these onerous and unreasonable conditions attached to P&G's purported accommodation, on most occasions when she felt ill, Ms. Kantrowitz simply continued to work standing up at the makeup counter, even though this was extremely uncomfortable and potentially unhealthy for her and her baby.

50.     P&G's proposed accommodation also required Ms. Kantrowitz to deduct her break periods, calculated in 15 minute increments and rounded up to the nearest increment, from her FMLA leave time.  Ms. Kantrowitz had been planning to use her entire FMLA to care for her baby.

51.     Fearful of losing her job, Ms. Kantrowitz reluctantly consented to this forced leave.

52.     Alarmed by the inadequacy of P&G's purported "accommodation," Ms. Kantrowitz met with Ms. Sood and Sandra Schmidt from HR on December 17, 2014.  She alerted them to the problems with P&G's proposal and asked about her rights as a pregnant woman under the New York City Human Rights Law.

53.     Instead of engaging in a constructive dialogue with Ms. Kantrowitz, the HR representatives responded with extraordinary hostility.  They denied any knowledge of pregnant women being protected by the New York City Human Rights Law, despite the fact that the law required employers to provide written notice to employees regarding the rights of pregnant workers as of May 30, 2014 (120 days from January 30, 2014, the day the law went into effect). *See* N.Y.C. Admin. Code § 8–107(22)(b)(i).

54.     Almost another month went by before P&G came up with an alternative accommodation proposal, by which time Ms. Kantrowitz was three months pregnant.  On January 15, 2015, P&G permitted Ms. Kantrowitz to take breaks in a more conveniently located area on the

floor where she worked.  However, Defendant still forbade her from sitting at the counter and continued to force her to use her FMLA leave time during her breaks—all while expecting her to meet the same rigorous sales goals as everyone else.

55.     When Ms. Kantrowitz again raised her concerns with Ms. Sood and Ms. Schmidt, reiterating that she was able to work while on breaks and objecting to the forced FMLA leave time, Defendant refused to change the accommodation.

56.     P&G refused to accommodate Ms. Kantrowitz by allowing her to take intermittent breaks sitting at the counter because it did not want a pregnant woman as the face of the company selling its products.

<u>**Ms. Kantrowitz's Termination**</u>

57.     On February 10, 2015, in retaliation for Ms. Kantrowitz's insistence on her right to a reasonable accommodation for her pregnancy, P&G falsely accused her of improperly having in her possession P&G's tester items.

58.     As part of her employment, Ms. Kantrowitz was required to wear D&G makeup while on the job. She and her fellow employees used "tester" items, or samples of the D&G makeup, to apply on themselves or customers who wanted to try out the products before making a purchase.

59.     Sales Associates like Ms. Kantrowitz regularly stored their personal items in see-through bags provided to them by Saks Fifth Avenue.  It was common practice for Ms. Kantrowitz and other Sales Associates to also hold tester items in these bags.

60.     In particular, Sales Associates Shizu Nonaka and Will Giffen also kept tester items in their clear plastic bags.  Neither of them were terminated or disciplined for doing so.

11

61.     Throughout her employment, Ms. Kantrowitz never brought the Saks Fifth Avenue bag or any tester items home with her, but rather always stored the tester items in the bag which she kept at the store.

62.     The P&G managers were aware that Ms. Kantrowitz and her colleagues maintained the tester items this way.  Nonetheless, on February 10, 2015, Mr. Sargeant and Kelsey McLean, a sales manager, accused Ms. Kantrowitz of keeping the tester items in the clear bag, a possible violation of Defendant's rules.  Ms. Kantrowitz was made to leave the store immediately.

63.     Three days later, P&G fired Ms. Kantrowitz.

64.     From the moment Ms. Kantrowitz divulged to P&G that she was pregnant, all of the company's subsequent actions—trying to force her to go on disability leave, offering her patently unreasonable accommodations, refusing to engage in a meaningful dialogue regarding her accommodations, and terminating her on pretextual grounds were designed to eliminate her from her position and retaliate against her for asserting her rights.

65.     As a result of P&G's actions, Ms. Kantrowitz suffered loss of employment, extreme emotional distress, mental anguish, and anxiety for which she sought the treatment of a counselor.

## FIRST CAUSE OF ACTION: SEX DISCRIMINATION UNDER TITLE VII
### (Discriminatory Firing Based on Ms. Kantrowitz's Pregnancy)

66.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

67.     In violation of Title VII, as amended by the Pregnancy Discrimination Act, Defendant discriminated against Plaintiff on the basis of her sex, which includes pregnancy, by terminating her employment because it did not want a pregnant woman selling its products.

68.     In taking the above described discriminatory actions, Defendant acted with malice

12

and reckless indifference to Plaintiff's rights under Title VII and the Pregnancy Discrimination Act.

69.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**SECOND CAUSE OF ACTION: SEX DISCRIMINATION UNDER TITLE VII**
**(Forced Leave Claim)**

70.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

71.     In violation of Title VII, as amended by the Pregnancy Discrimination Act, Defendant discriminated against Plaintiff on the basis of her sex, which includes pregnancy, when as a condition of accommodating her pregnancy by giving her breaks, it forced her to use her FMLA leave time.

72.     In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under anti-retaliation provision of Title VII and the Pregnancy Discrimination Act.

**THIRD CAUSE OF ACTION: UNLAWFUL RETALIATION UNDER TITLE VII**

73.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

74.     In violation of Title VII, as amended by the Pregnancy Discrimination Act, Defendant unlawfully retaliated against Plaintiff by terminating her after she engaged in the protected activity of requesting a reasonable accommodation and opposing Defendant's refusal to reasonably accommodate her.

13

75.     In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under anti-retaliation provision of Title VII and the Pregnancy Discrimination Act.

76.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**FOURTH CAUSE OF ACTION: DISABILITY DISCRIMINATION UNDER THE ADA**

77.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

78.     Plaintiff suffered from a disability that is covered by the ADA.

79.     Defendant knew of Plaintiff's disability prior to her firing.

80.     Defendant discriminated against Plaintiff on the basis of her disability, in violation of the ADA, by failing to offer Plaintiff a reasonable accommodation for her disability and by terminating Plaintiff's employment because of her disability.

81.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**FIFTH CAUSE OF ACTION: ADA RETALIATION**

82.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

83.     In violation of the ADA, Defendant unlawfully retaliated against Plaintiff by terminating her after she repeatedly requested a reasonable accommodation so she could continue

her employment during her pregnancy.

84.     In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under anti-retaliation provision of Title VII and the Pregnancy Discrimination Act.

85.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**SIXTH CAUSE OF ACTION: VIOLATION OF**
**NEW YORK CITY HUMAN RIGHTS LAW**
**(Sex Discrimination)**

86.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

87.     In violation of the NYCHRL, Defendant discriminated against Plaintiff on the basis of her sex and pregnancy when it fired her.

88.     In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under the NYCHRL.

89.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's discriminatory practices.

**SIXTH CAUSE OF ACTION: VIOLATION OF**
**NEW YORK CITY HUMAN RIGHTS LAW**
**(Pregnancy Discrimination: Failure to Accommodate)**

90.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

91.     In violation of the NYCHRL, Defendant discriminated against Plaintiff on the basis of her sex and pregnancy when it fired her.

92.     In violation of the NYCHRL, Defendant discriminated against Plaintiff when it refused to offer her reasonable accommodations for her pregnancy which would allow her to satisfy the essential requisites of her job.

93.     In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under the NYCHRL.

94.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's discriminatory practices.

## SEVENTH CAUSE OF ACTION: VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW
### (Pregnancy Discrimination: Retaliation)

95.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

96.     In violation of the NYCHRL, Defendant unlawfully retaliated against Plaintiff by terminating her after she repeatedly requested a reasonable accommodation for her pregnancy-related symptoms which would allow her to satisfy the essential requisites of her job.

97.     In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under anti-retaliation provision of the NYCHRL.

98.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

16

**EIGHTH CAUSE OF ACTION: VIOLATION OF**
**NEW YORK CITY HUMAN RIGHTS LAW**
**(Disability Discrimination: Failure to Accommodate)**

99.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

100.     Plaintiff suffered from a disability that is covered by the NYCHRL.

101.     Defendant knew of Plaintiff's disability prior to her firing.

102.     Defendant failed to engage in an good faith interactive process with Plaintiff after she requested a reasonable accommodation.

103.     Defendant discriminated against Plaintiff on the basis of her disability, in violation of the NYCHRL, by failing to offer Plaintiff a reasonable accommodation for her disability and by terminating Plaintiff's employment because of her disability.

104.     Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**NINTH CAUSE OF ACTION: VIOLATION OF**
**NEW YORK CITY HUMAN RIGHTS LAW**
**(Disability Discrimination)**

105.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

106.     Plaintiff suffered from a disability that is covered by the New York City Human Rights Law.

107.     Defendant knew of Plaintiff's disability prior to her firing.

17

108.    Defendant discriminated against Plaintiff on the basis of her disability, in violation of the New York City Human Rights Law, by firing her.

109.    Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**TENTH CAUSE OF ACTION: VIOLATION OF
NEW YORK CITY HUMAN RIGHTS LAW
(Disability Discrimination: Retaliation)**

110.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

111.    In violation of the NYCHRL, Defendant unlawfully retaliated against Plaintiff by terminating her after she repeatedly requested a reasonable accommodation for her pregnancy-related symptoms which would allow her to satisfy the essential requisites of her job.

112.    In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to Plaintiff's rights under anti-retaliation provision of the NYCHRL.

113.    Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.      Declaring the acts and practices complaint of herein to be violations of Title VII, the Pregnancy Discrimination Act, the ADA, and the New York City Human Rights

18

Law;

b.      Enjoining and permanently restraining these violations of law;

c.      Directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d.      Directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's unlawful conduct, and making her whole for all earnings and other benefits she would have received but for Defendant's unlawful conduct, including but not limited to wages, commissions, other lost benefits, loss of good will, and interest thereon;

e.      Directing Defendant to pay plaintiff compensatory damages, including damages for her mental anguish, denial of life's pleasures, pain and suffering and humiliation, as well as punitive damages;

f.      Awarding Plaintiff the costs of this action together with reasonable attorney fees;

g.      Directing Defendant to pay statutory and punitive damages; and,

h.      Granting such other relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands that this proceeding be tried to a jury.

Dated:  New York, New York
        April 15, 2016

                               BERANBAUM MENKEN, LLP

          By:              _____/s/_____

                          John A. Beranbaum
                          Scott Simpson
                          80 Pine Street, 33rd Floor

New York, NY 10005
Ph: (212) 509-1616
Fax: (212) 509-8088